IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SIDNEY A. LAUVER,

        Plaintiff,

        v.                                Civil Action No. 2:08-CV-87

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.      Background

      Plaintiff, Sidney Lauver (Claimant), filed a Complaint on August 27, 2008 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on April 3,

2009.[2]  Claimant filed his Motion for Judgment on the Pleadings on May 1, 2009.[3]

Commissioner filed his Motion for Summary Judgment on June 1, 2009.[4]

B.      The Pleadings

      1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 12.

[3] Docket No. 15.

[4] Docket No. 17.

2.      <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C.      <u>Recommendation</u>

I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because the ALJ's decision to deny Claimant Social Security benefits was supported by substantial evidence. The ALJ correctly identified and considered Claimant's impairments, correctly assessed Claimant's credibility, and afforded appropriate weight to the treating physician's opinions.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A.      <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on April 24, 2007, alleging an onset date of April 23, 2007, due to "bulged discs" and low back, leg, shoulder, and right elbow pain. (Tr. 109-13, 128). The claim was denied initially on June 8, 2007, and upon reconsideration on August 13, 2007. (Tr. 55-57, 61-63). Claimant filed a written request for a hearing on September 13, 2007. (Tr. 64). Claimant's request was granted and a hearing was held on March 13, 2008. (Tr. 28-51).

The ALJ issued an unfavorable decision on April 10, 2008. (Tr. 17-27). The ALJ determined Claimant was not disabled under the Act because he had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526), and there are jobs that exist in significant numbers in the national economy that the Claimant can

perform (20 CFR 404.1560(c) and 404.1566).  (Tr. 23-26).  On April 14, 2008, Claimant filed a request for review of that determination.  (Tr. 16).  The request for review was denied by the Appeals Council on August 1, 2008.  (Tr. 1-4).  Therefore, on August 1, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on June 23, 1959, and was forty-eight (48) years old as of the onset date of his alleged disability and forty-nine (49) as of the date of the ALJ's decision.  (Tr. 33).  Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c) (2009).  Claimant completed the seventh grade and has past relevant work experience as a drywall finisher.  (Tr. 34, 132, 138).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Medical Records, P. Kent Thrush, M.D., 4/2/07 - 5/7/07 (Tr. 190-93)**
5/7/07
Note from Dr. Thrush stating that Claimant is unable to return to work

4/18/07 Notes
diagnosed with degenerative spondylolisthesis at L5 on S1; has a disc bulging at L4-L5 and L5-S1; no major nerve root compression, disc bulge, or herniation at L4-L5 on the left but it is pretty mild.  No major spinal stenosis.  Has a lot of back pain, however.
Normal strength of hip flexion, hip extension, hip abduction, knee flexion, ankle dorsiflexion, ankle plantar flexion and extensor hallucis longus.  No history of bowel or bladder difficulty.

Has a pretty bad back, degenerative disc disease at L4-L5 and L5-S1. He is going to check with social security to see how much he will get paid. He is going to check with his union to see how much he will get paid on retirement. Maybe he can get enough if he retires that he can get by. Spinal fusion is an option, but it is a big operation. He is neurologically intact.

4/6/07 MRI Report
procedure: lumbar spine without contrast
impression: bilateral spondylolysis at L5 with grade 2 spondylolisthesis and bilateral foraminal narrowing; mild central and left central herniation at L4-L5 causes mild left foraminal narrowing

4/2/07 Notes
Claimant has chronic back pain off and on. Normal strength of hip flexion, hip extension, hip abduction, hip adduction, knee flexion, knee extension, ankle dorsiflexion, ankle plantar flexion, and extensor hallucis longus. Claimant claims pain mostly down the left leg. Does have positive sciatic type symptoms, positive straight leg raising on the left to 60 degrees and negative on the right.
Pulses are normal. No motor or sensory deficits.

**Physical Residual Functional Capacity Assessment, Fulvio Franyutti, M.D., 5/30/07 (Tr. 194-201)**
Exertional Limitations
•        occasionally lift: 20 pounds
•        frequently lift: 10 pounds
•        stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
•        sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
•        push and/or pull (including operation of hand and/or foot controls) unlimited
Postural Limitations
•        climbing ramp/stairs: occasionally
•        climbing ladder/rope/scaffolds: never
•        balancing: occasionally
•        stooping: occasionally
•        kneeling: occasionally
•        crouching: occasionally
•        crawling: occasionally
Manipulative Limitations
•        none established
Visual Limitations
•        none established
Communicative Limitations
•        none established
Environmental Limitations
•        extreme cold: avoid concentrated exposure
•        extreme heat: unlimited
•        wetness: unlimited

- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure

Symptoms: Claimant appears to be credible, allegations supported by findings. (See MRI Reports)

Treating or Examining Source Statements
- Dr. Thrush 5/7/07: unable to return to his employment as a drywall finisher secondary to DDD and spondylolisthesis of L-spine

Additional Comments
Credibility cannot be assessed; he did not return ADL or PPQ.


**Adult Mental Profile, Jennifer Robinson, M.A., 7/17/07 (Tr. 202-06)**

Assessments Completed
- Wechsler Adult Intelligence Scale - Third Edition (WAIS-III)
- Wide Range Achievement Test - Fourth Revision (WRAT-4)
- Mental Status Examination (MSE)
- Clinical Interview (CI)

General Observations: good hygiene and grooming; drove himself; attitude and cooperation were appropriate; walked stiffly

Chief Complaints: Lauver indicated he is applying for benefits due to having degenerative spine disease; indicated he has a bulging disk and pain in right shoulder and elbow.

Presenting Symptoms: pain in right shoulder and elbow; difficulty walking, lifting, and standing; sleep is poor; reported low energy and depressed mood

Mental Status Examination:
- appearance: good hygiene and grooming
- attitude/behavior: good eye contact; elaborate verbal responses
- speech: relevant and coherent
- orientation: oriented x4
- mood: appeared mildly depressed
- perception: no indication of any formal thought disorder
- insight: insight into his problems was adequate
- judgment: judgment skills moderately deficient as indicated by a score of 5 on Comprehension
- suicidal/homicidal ideation: denied
- recent memory: severely deficient
- remote memory: mildly deficient
- concentration: within normal limits as indicated by a score of 9 on Digit Span

Intellectual Assessment:
WAIS-III:

| IQ SCALE | SCORE |
| --- | --- |
| Verbal | 82 |
| Performance | 73 |

Full Scale                     76

| INDEX | SCORE |
|---|---|
| Verbal Comprehension | 88 |
| Perceptual Organization | 78 |

| VERBAL SUBTESTS | SS | PERFORMANCE SUBTESTS | SS |
|---|---|---|---|
| Vocabulary | 8 | Picture Completion | 8 |
| Similarities | 7 | Digit Symbol-Coding | 4 |
| Arithmetic | 5 | Block Design | 4 |
| Digit Span | 9 | Matrix Reasoning | 6 |
| Information | 8 | Picture Arrangement | 5 |
| Comprehension | 5 | | |

WRAT-4

| AREA | STANDARD SCORE | GRADE |
|---|---|---|
| Word Reading | 63 | 8.6 |
| Spelling | 72 | 4.4 |
| Math Computation | 73 | 4.0 |

Diagnostic Impressions

| Axis I | 311 | depressive disorder, NOS |
|---|---|---|
| Axis II | V62.89 | borderline intellectual functioning |
| Axis III | | degenerative spine disease, bulging disk, pain in right elbow and right shoulder, asthma, by self report |

Prognosis: fair
Daily Activities: does not do any cooking, cleaning, or laundry; if he does shop, he only gets very few items at a time; able to drive short distances.  Hobbies include watching television and sitting outside.
Concentration: within normal limits
Persistence: within normal limits
Pace: within normal limits
Immediate Memory: within normal limits
Recent Memory: severely deficient
Capability: if granted benefits, he would be capable of managing personal finances

**Psychiatric Review Technique, Jim Capage, Ph.D. 8/1/07 (Tr. 207-20)**
Categories Upon which the Medical Disposition is Based:
•     12.02 Organic Mental Disorders
•     12.04 Affective Disorders
12.02 disorder: BIF
12.04 disorder: depressive disorder, NOS per CE
Functional Limitation
•     restriction of activities of daily living: mild degree of limitation

- difficulties in maintaining social functioning: mild degree of limitation
- difficulties in maintaining concentration, persistence, or pace: moderate degree of limitation
- episodes of decompensation, each of extended duration: none

Consultant's Notes
- verbal - 82
- performance - 73
- full scale - 76
- valid scores
- mood: mildly depressed
- insight: adequate
- judgment: moderately deficient
- recent memory: severely deficient
- remote memory: mildly deficient
- social functioning: WNL
- concentration: WNL
- doesn't comprehend the value of money
- gets irritated easily
- doesn't handle stress well
- Based on the MER, the claimant's statements are found to be generally credible.
- Claimant alleged LD and Depression. No hx of Psych tx. A CE indicated BIF and Depressive Disorder, Nos. Criteria "B" ratings indicate that the mental impairments are severe, but do not meet nor equal the Listings. A MRFC assessment is indicated.

**Mental Residual Functional Capacity Assessment, Jim Capage, Ph.D. 8/1/07 (Tr. 221-24)**

Understanding and Memory
- ability to remember locations and work-like procedures:    not significantly limited
- ability to understand and remember very short simple instructions: not significantly limited
- ability to understand and remember detailed instructions:    moderately limited

Sustained Concentration and Persistence
- ability to carry out very short and simple instructions:    not significantly limited
- ability to carry out detailed instructions:    moderately limited
- ability to maintain attention and concentration for extended periods: moderately limited
- ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances:    not significantly limited
- ability to sustain an ordinary routine without special supervision: not significantly limited
- ability to work in coordination with or proximity to others without being distracted by them:    Not significantly limited
- ability to make simple work-related decisions:    not significantly limited
- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods:    moderately limited

<u>Social Interaction</u>
- ability to interact appropriately with the general public:        not significantly limited
- ability to ask simple questions or request assistance:         not significantly limited
- ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited
- ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes:                                 not significantly limited
- ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness                                 not significantly limited

<u>Adaptation</u>
- ability to respond appropriately to changes in the work setting:  not significantly limited
- ability to be aware of normal hazards and take appropriate precautions: not significantly limited
- ability to travel in unfamiliar places o ruse public transportation: not significantly limited
- ability to set realistic goals or make plans independently of others: not significantly limited

<u>Functional Capacity Assessment</u>: MER dictates that the Claimant has severe mental impairments that do not meet nor equal the listings.  They do impose moderate limitations upon functioning as reflected by the ratings of Part I of this form.  Seems he retains the mental-emotional capacity to perform routine work-related activities in a low-pressure setting with usual supervision.


**P. Kent Thrush, Letter, November 1, 2007 (Tr. 226)**
"I think that he does have a pretty bad back.  He has x-rays, which show degenerative spondylolisthesis of L5 on S1 with bulging at L4-L5 and L5-S1.  I did not see anything like a major disc herniation on his prior MRI but he certainly has enough degenerative arthritis and degenerative disc disease and this degenerative spondylolisthesis to cause him a lot of back pain and unfortunately he has done heavy labor all of his life."
Normal strength of hip flexion, hip extension, hip abduction, knee flexion, knee extension, ankle dorsiflexion, ankle plantar flexion and extensor hallucis longus.
No motor or sensory deficits


**John Manchin Sr. Health Care Center, Treatment Notes, 3/6/08 - 6/6/05 (Tr. 227-32)**
<u>3/6/08</u>
Claimant saw Dr. Douglas (neurosurgeon) who gave him shot in the back.
<u>2/14/08</u>
Claimant referred by Dr. Thrush to a neurosurgeon.
<u>1/3/08</u>
(illegible)
<u>12/4/07</u>
Claimant feels he has severe pain and limitation in left hip joint
<u>11/5/07</u>
<u>9/27/07</u>
<u>9/11/07</u>
- chest x-ray taken

- pain in chest, left arm, left side of jaw
- smoker

6/6/05

**X-ray, John Manchin Sr. Health Care Center, 9/11/07 (Tr. 233)**
reveals the heart to be normal.  Lung fields are clear.  No other abnormalities are noted.

    D.    <u>Testimonial Evidence</u>

        Testimony was taken at the hearing held on March 21, 2007.  The following portions of the testimony are relevant to the disposition of the case:

    Q    And when you worked in '07, in April, what did you do?

    A    I was a drywall finisher.

    Q    And a drywall finisher, could you tell the Judge basically what you did in that job?

    A    I did drywall work, all types of drywall work and finished them, most of the time I finished drywall.  Sometimes I hung drywall.

    Q    So if we used the phrase hung drywall, would you be using a piece of sheet, what we would call sheet rock or siding material, 4 by 8 or larger, 4 foot by 8 foot?

    A    Yeah, 4 foot by 8 foot, 4 by 12 foot, 5/8" to 1/2".

    Q    How much do you think that would basically weigh?

    A    Oh, that weighs, 5/8"s probably 90 pounds.

    Q    Okay.  And you'd have to drive nails into this stuff, into a 2 by 4 or 2 by 6 to hold it up on the wall?

    A    We run screw guns into it.

    Q    Screw guns?

A        Uh-huh.

Q        And once you've got it up on the wall, these sheets, they would not blend perfectly together, would they?

A        No.

Q        So you'd have to do something to it.  What would you then do to it?

A        Oh, I finished it, I would tape it and do the mud work, flush it in.  I've done most of these buildings down here in Morgantown, a lot of them.

Q        About what time of day would you start?

A        7:00.

Q        And what time would you generally finish?

A        Well, it would depend on how long we worked.  Sometimes we worked overtime.  Sometimes we'd work tens.  Sometimes we'd work eights, you know.  Most of all, we worked eights but a lot of times we would have to work tens and work five or six days a week.

Q        How long would you say you did that job?

A        How long did I do that job?

Q        Yeah, like how many years?

A        Oh, probably every bit of 30, maybe 30, longer than that because I had done it before.

                              *                    *                    *

Q        Did you ever work on stilts?

A        Yes, I did.

Q        Stilts, that's because you could be off the ground and reach the high parts?

A Exactly.

Q Okay.  So the mud, the mud, we call mud, it's the finishing material you put on the seams.  How much would a bucket of that weigh, approximately?

A 62 pounds.

Q You'd carry that?

A Yeah.

Q Maybe more than one at a time.

     *    *    *

Q Why did you have to stop working in drywalling?

A Because of my back.

Q All right, tell us about your back.  If you can make the judge understand what happened back there in '07?

A Well, I hurt for a while.  My back, I've had prior back trouble.  And it just started hurting so bad that I had them call a doctor.  And I called a doctor and made an appointment, and he scheduled me for an MRI and I went and had the MRI.

Q Now, just a minute.  What doctor did you schedule with?

A Dr. Thrush.

Q All right.  And you went and got an MRI?

A Right.

Q Did, did the doctor talk to you about that MRI?

A Yes, when I went back to see him, he asked me if I had thought about not doing, not working anymore because he said I was just going to hurt myself.

Q	All right.  And, did he examine you?

A	Worse.

Q	Worse?  Did he examine you?

A	Right.

Q	Did he tell you anything else about your back condition?

A	He told me that I had a degenerative disk disease and that I had a couple, that I had some disks messed up.  You know, I don't know the technical stuff for it.

Q	Okay.  What did you tell him was, what did you tell him was bothering you?

A	My back and, my back and my legs, and my back, well my whole leg down into my  foot and my toes, across the bottom of my back into my hip joint real bad and up my back, and up, almost halfway up my back.  And I get, I get muscle spasms and stuff in my back if I, if I stood for a while or if I was walking and stuff like that.  My back and muscles are set straight up, like I am now, my back muscles will spasm up and feels like it wants to pull me to the left.

Q	Okay.  Now let me just interrupt you a minute, back pain, the judge, I want to talk to you about three, your neck, your mid-back and your low back.  Where would you say the lumbar, thoracic or cervical is the words I want to use.  Where would you say your back hurts the most, mid, upper, or lower?

A	The lower.

Q	Lower back?

A	Uh-huh.

Q	But those muscles spasms, do they go, you kind of pointed to your back up around your rib cage.  Do they go up?

A    Yes, they do.  They come up from the bottom of my back, right up through, up under my shoulder.  And it - -

Q    You using - -

A    - - feels like it pulls.  It feels like it's pulling me sideways.  It feels like it's just pulling me over.  I don't know how to explain it - -

Q    That's okay.

A    It just feels like it's pull me to the left.

Q    Do you have trouble bending and twisting?

A    Oh, yeah.

Q    Because I noticed you used your cane as a pointer.  Can you not turn around and put your hand back there?

A    Not very good.

Q    Okay.  And does that low back pain, is it there all the time, part of the time?

A    It's there all of the time and sometimes it's there, I mean I hurt right now but sometimes it hurts bad enough I have to go to the emergency room and stuff.

Q    Okay.  Does that pain go anywhere?  Does it go anywhere from your back?

A    It goes down my leg.

Q    Which leg?

A    Well, actually it goes down this one too, but it goes down, it goes down my left one.  But the right one is, the right one hurts down to about my knee about half the time.

Q    So your left one?

A    Yeah.

Q     So your left one is the one it hurts down through - -

A     Right.

Q     - - through your buttocks?

A     It hurts in my butt, in my hip joint, down, down the side of my leg here and towards the back of it, and down my calf and clear into my toes. I've got three toes on my left foot, my little toe, and the one next to it, and the one next to it, if you squeeze them, I mean if you touch them, they feel like somebody has actually hit them with a hammer or dropped something on that foot right there. And I can't remember ever, I may have at one time, but I don't know why I would feel that. I've only felt it since my back has been like this.

Q     Okay. And I notice you have a cane with you today. Why do you carry that cane?

A     Because it relieves the pressure on the side of my back some and I can get along. Not only that, I can rest on it. If I walk very far I got to take a stop.

Q     And so how far do you think you can walk?

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q     Was the cane prescribed sir, by a doctor?

A     No, sir. It was not.

Q     You just went, got it on your own sort of?

A     No, my sister gave it to me.

Q     Oh.

A     Because she said that I needed one and I never, after I started, after I used it, I knew I needed it. I mean - -

14

Q       Okay.  Thank you.

BY ATTORNEY:

Q       About how far can you walk?

A       Well, I can walk probably 100, 100 feet or so.

Q       So out here today you were in the parking lot, I assume.  Did you drive up here today?

A       Yes, I did.

Q       Okay.  And you got out of your vehicle.  About how, so you walked into the hearing room here, that's probably 100 feet or so.  So you made that okay?

A       Well, I made it, but I mean I guess I made it okay.

Q       But what?

A       Well, I mean it hurts.  I mean I have to, like I said, if I walk much farther than that, I've got to stop and get on something, you know what I mean?  Try to - -

Q       Do you have - -

A       - - relieve some pressure.

Q       Do you have some difficulties remaining seated?

A       Yes, I do.

Q       About how long do you think you can remain seated?

A       Not very long, maybe, I don't know, maybe, maybe 45 minutes or an hour.

Q       And can you sit in the same position all that time?

A       No, I can't.

Q       I noticed you kind of shift from your left hip to your right hip and you kind of

lean back, why is that?

A       Because it takes, relieves, I try to relieve myself as much as I can.  I have to, I stay up for like three or four hours, I have to lay down.  And I mean I've got to lay down or lay back and put my feet up and elevate them and stuff because it just, I go through a hell of a lot of pain most of the time.

*                    *                    *

Q       What about medication?  Did the doctor give you some medications for some of these problems?

A       Yes, he did.

Q       And what do you take?

A       I take Lortab, 1050 for pain.  I take some kind of depression medicine and I take blood pressure medicine.  and there is something else I take.  I don't know.  I know I take them three all the time.

Q       Do these things, particularly with the pain, do they help you?

A       They help me somewhat.  They don't get rid of it.

Q       Do they - -

A       They don't make it go away, but it helps to the point where I can stand, sometimes I can't stand it.   I mean I've, I mean even with it sometimes I, sometimes it's just unbearable.  There's been, there's been a few times if I'd had a revolver in the house I'd smoked myself.  I don't want, I don't want to be like this for the rest of my life.  I want to get me a, I want to get the surgery.  I mean they told me about how risky it was and all that stuff and I was a smoker and it, you know, some doctors wouldn't want to work on you because you smoked all

your life and stuff like that.  But I'm, I'd like to take that chance if I could get even a little bit better.

*          *          *

Q       And this surgery, was that the surgery Dr. Thrush discussed with you?

A       Yeah.  Well, yeah.  Yes, that's the surgery.

Q       About putting, is that when he talked about putting rods in your back?

A       Rods, and plates, and screws.

Q       Uh-huh.

A       He said it was, he told me it was a major, major surgery and I didn't want to get it at first, but as times went on, I decided that I would certainly take a chance at the surgery.

*          *          *

Q       I noticed that there's records from the Mansion Clinic where you're there for depression?

A       Right.

Q       And you had an examination and the lady that talked to you said you had a depressive disorder.  Do you feel like you're depressed?

A       I think anybody in my shoes would be depressed.  I'm very depressed.  I mean I worked all my life.  I can't do nothing that I used to do.  I mean I can't fish.  I can't hunt.  I can't do any of the things, ride motorcycles.  I mean that was something I dearly loved.  I can't do none of that stuff.  And I feel like I'm about like 1/4 of a man, you know, that I used to be, you know.

*          *          *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q     Have you had an opportunity to review the vocational aspects of the file?

A     Yes.

Q     Is there any other information about the claimant's past work that you would need?

A     No, Your Honor.

Q     And would you describe his work in the past 15 years, in terms of skill and exertional level?

A     He had worked as a drywall finisher.   Exertional level is medium, skill level is skilled.  He also stated that he was a drywall installer.  The exertional level for an installer is very heavy and the skill level is skilled.

Q     All right.  Then let me ask you to assume a hypothetical individual of the claimant's age, educational background, and work history who could perform a range of light work, would need a sit/stand option.  Could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds.  Should do while walking on level and even surfaces.  Should not be exposed to temperature extremes or hazards.  Should work in a low stress environment with no production line type of case or independent decision making responsibilities.  Would be limited, at this time, to unskilled work involving only routine and repetitive instructions and tasks and not requiring any more than the basic reading, and writing, or math.   Should have no interaction with the general public.  No more than occasional interaction with others, mainly coworkers and supervisors.

      Would there be any work in the regional or national economy that such a person could

perform?

A       The region I'll be using is all of West Virginia, Western Maryland, Western Pennsylvania, and Eastern Ohio.  In terms of the light exertional level, Your Honor, a laundry worker working as a folder, 88,000 nationally, 1,300 regionally.  And because the hypothetical includes a sit/stand option, Your Honor, I'd reduce those numbers in half.

Also, a garment sorter, 178,000 nationally, 1,300 regionally.  And again, Your Honor, I've reduced those numbers in half and that's based upon my experience in placing individuals, Your Honor.

Q       All right.  If you would reduce the exertional level to sedentary and retain, keep the other limitations I've gave you.

A       Under the sedentary level, a general sorter, 25,000 nationally, 900 regionally.

A bench worker, 103,000 nationally, 2,100 regionally.

Those are samplings, Your Honor.

Q       All right.  If the person used a cane for ambulation, would that impact on any of the jobs you've named?

A       If he could maintain production rates, you know, if production rates are required in those positions, no he could not.

Q       Okay.  And is anything in your testimony inconsistent with anything contained in the  DOT?

A       The numbers that I've reduced in the light exertional level, Your Honor, are based upon my experience.

ALJ          Yes, Your Honor.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q       Mr. Ganoe, maybe the Judge asked. I'm not sure I heard or understood the question exactly, but if this person had a cane and would have difficulty standing or walking to a point of say they would be off task an hour or two per day, that would interfere with the production end of being able to do those jobs; is that what you said?

A       Well, if he were off task like two hours a day because of that - -

Q       Or for any reason really?

A       - - for any reason, he wouldn't be able to perform the work.

Q       And that reason could be the fact that you have to use your hands to hold yourself when you sit?

A       It could be.

Q       If the person missed work two days a week because they weren't able to ambulate or get to the job because of pain, that would impact those same jobs. Isn't that correct?

A       Two days a week?

Q       Two days a week, yes.

A       Yes, it would.

ATTY        Your Honor, we have no more questions.

*               *               *

E.      Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how Claimant's alleged impairments affect his daily life:

- spends most of his days in the recliner (Tr. 42)

- has trouble putting on shoes and socks (Tr. 42)

- has trouble putting on pants (Tr. 43)

- has trouble carrying any weight in addition to body weight (Tr. 43)

- can stand no longer than 15 to 20 minutes (Tr. 43)

- is a smoker (Tr. 44)

- has a hard time reading words at a distance (Tr. 45)

- has trouble remembering things (Tr. 45)

- can no longer hunt, fish, or ride motorcycles (Tr. 46)

- has trouble socially without his girlfriend to help him (Tr. 46)

- watches television (Tr. 146)

- visits family (Tr. 146)

- drives to the grocery store twice each month (Tr. 146, 149)

- has no problem with personal care (Tr. 147)

- does not prepare own meals (Tr. 148)

- needs encouragement to cut the grass and complete household chores (Tr. 148)

- goes outside 2 - 3 times each week (Tr. 149)

- drives (Tr. 149)

- is able to pay bills, count change, handle a savings account, and use a checkbook (Tr. 149)

- spends time with family and friends (Tr. 150)

- is able to follow written and spoken instructions (Tr. 151)

- gets along well with authority figures (Tr. 152)

- was not medically advised to use a walking device, but uses a cane (Tr. 153)

### III.  The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant argues that the ALJ's decision to deny the Claimant DIB and SSI is not supported by substantial evidence because the ALJ mischaracterized Claimant's degenerative disc disease as mild rather than severe, failed to perform an appropriate credibility analysis, and failed to properly consider the opinions of a treating physician.

Commissioner contends that the ALJ's decision is supported by substantial evidence because the Claimant failed to prove that he is disabled as defined by the Act.  Commissioner argues that the ALJ properly considered Claimant's severe impairments in the residual functional capacity assessment by accounting for a significant limitation on Claimant's ability to perform work activities, properly evaluated Claimant's complaints of pain and limitations and reasonably concluded that Claimant was not entirely credible, and properly weighed the treating physician's opinion with the medical evidence of record.

B.     Discussion

I.     Whether the ALJ Properly Identified and Considered Claimant's Severe Impairments.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ erred by finding that Claimant had mild degenerative disc disease as a severe impairment at step two of the sequential evaluation process.  Commissioner contends that the ALJ found in Claimant's favor at step two by finding that his mild degenerative disc disease was a severe impairment, causing "significant limitation" in his ability to perform work activities.

To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

At step two of the sequential evaluation process, the ALJ is required to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). A severe impairment is "one which impacts more than minimally on an individual's functional ability to perform basic work activities." Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). In order to properly evaluate the severity of mental impairments, the ALJ must consider the factors contained in section 12.00 of the Listing of Impairments in Appendix 1. The factors contained in section 12.00 are separated into four broad functional areas in which the Commissioner rates the degree of claimant's functional limitations, specifically, 1) activities of daily living; 2) social functioning; 3) concentration, persistence or pace; and 4) episodes of decompensation. 20 C.F.R. § 404.1520(a).

Claimant argues that the ALJ made a critical error at step two, which infected the remainder of his decision, by classifying Claimant's degenerative disease as a mild degenerative disease rather than severe. Commissioner contends that the medical evidence overwhelmingly

supports the ALJ's finding that Claimant had only a mild impairment. The ALJ's findings will be upheld as long as they have substantial evidence to support them. <u>Hayes v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

The Court agrees with the ALJ's assertion that Claimant has a mild degenerative disc disease. The objective medical evidence of record refers to Claimant's degenerative disc disease as just that - degenerative spondylolisthesis. (Tr. 191, 192, 205). Further, a report on April 20, 2007, by Dr. Thrush indicates that Claimant has "chronic back pain off and on." (Tr. 193). Additionally, the record shows that in his Physical Residual Functional Capacity Assessment on May 30, 2007, Dr. Franyutti indicated that Claimant could lift up to 20 pounds, sit for up to six hours, stand for six hours, and push and pull an unlimited amount of weight. (Tr. 195). The only restrictions placed on Claimant by Dr. Franyutti were climbing ladders, ropes, and scaffold. (Tr. 196). The Court believes there is more than a scintilla of evidence supporting the ALJ's characterization of Claimant's degenerative disc disease as mild; therefore, the ALJ did not err in his assessment.

II.     Whether the ALJ Properly Evaluated Claimant's Complaints of Pain and Limitations and Assessed Claimant's Credibility.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly attacked Claimant's credibility. Commissioner contends the ALJ considered Claimant's subjective complaints but reasonably concluded, based on the evidence of record, that Claimant's complaints were not entirely credible.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays, 907 F.2d at 1456. "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig, 76 F.3d at 589). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ improperly discredited Claimant's subjective complaints. While it is true that under the Regulations the ALJ must consider certain factors when evaluating credibility, the Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Under Craig, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. Id. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment. Id. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ must consider the claimant's statements, he need not credit them to the extent they are inconsistent with the objective medical

evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

The ALJ properly followed the two-step analysis outlined in Craig.  First, the ALJ considered whether the Claimant had an impairment stating "that the [c]laimant has medical impairments that could reasonably be expected to cause some of the symptoms described."  (Tr. 25).  The ALJ then weighed Claimant's testimony when considering all the evidence and concluded that the "the [c]laimant does experience some back pain and depression from time to time, but not to the frequency and severity alleged."  (Tr. 25).  In this case, the ALJ based his credibility determination on a variety of facts and observations.  First, in finding Claimant exaggerated his pain at the meeting, ALJ considered the behavior in light of the "relatively benign clinical signs and imaging findings reported by Dr. Thrush."  (Tr. 24).  Dr. Thrush characterized Claimant's back pain as "degenerative spondylolisthesis at L5 on S1," "disc bulging of L4-L5 and L5-S1," "no major nerve root compression, disc bulge, or herniation at L4-

L5 on the left, but it is pretty mild," and "pretty bad back, degenerative disc disease at L4-L5;" (Tr. 191) "chronic back pain off and on;" (Tr. 193); and "pretty bad back." (Tr. 226). Second, the ALJ notes that the Claimant had a "significant treatment gap of over two years with his primary care physician at the Manchin Clinic from June 2005 to September 11, 2007." (Tr. 25). The ALJ further notes that "even the reports from the Manchin clinic showed no significant abnormal objective clinical signs on physical examination or imaging findings, reporting primarily the claimant's subjective complaints of the 'same old stuff' . . . ." (Tr. 25). Third, the ALJ examined lifestyle evidence indicating that Claimant was not prescribed a cane but was given one by his sister, and Claimant is still able to drive. (Tr. 24). Finally, and perhaps most indicative of the ALJ's correct credibility analysis, the ALJ states he "does agree with Dr. Thrush's assessment that the [c]laimant does have some degree of significant limitation due to his permanent and severe lumbar impairment, but the objective medical evidence does not suggest a totally disabling condition." (Tr. 25).

In arguing that the ALJ incorrectly engaged in the credibility analysis, Claimant relies on the District Court's opinion in Lower v. Comm. of Social Security, 2:04-CV-57, 5-6 (U.S.D.C., N. Dist. of W.V. 2007) and cases analyzing "sit and squirm jurisprudence." Claimant's reliance is misplaced. First, Claimant is correct in stating that Judge Maxwell overturned this Court's negative credibility finding in Lower v. Comm. of Social Security. However, Judge Maxwell overturned the credibility analysis because, unlike in this case, there was no medical evidence in the record to support the ALJ's negative credibility finding in Lower. In the Report and Recommendation, this Court relied primarily on inconsistent statements and actions by the

claimant in determining the claimant was not entirely credible.[5]   However, in this case, as previously enumerated, the ALJ cites medical records that support his finding that Claimant's pain is exaggerated.  Following the same reasoning, Claimant's reliance on cases citing "sit and squirm jurisprudence" is misplaced.  Claimant cites Jenkins v. Bowen, 819 F.2d 1138 (4th Cir. 1987).  However, this case was remanded and ultimately decided in 1990.  Jenkins v. Sullivan, 906 F.2d 107 (4th Cir. 1990).  In Jenkins, the Fourth Circuit held the ALJ erred by engaging in "sit and squirm jurisprudence."  Id. at 108.  As explained by the Court, the ALJ "discredited Jenkins' testimony on pain based partially on his observation that Jenkins did not seem to be in any discomfort during the hearing, and partially on his conclusion that Jenkins' physical condition did not support the claim of pain."  Id.  The Court stated that the proper standard for evaluating disabling pain is to examine an individual's statements as to pain "established by medically acceptable clinical or laboratory diagnostic techniques."  Id.  The ALJ, therefore, erred by examining only claimant's physical condition at the hearing.  The negative credibility finding in the case at bar was, however, conducted correctly.  The ALJ examined Claimant's subjective complaints in light of the medical evidence and concluded that the medical evidence did not support Claimant's subjective complaints.

   "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."  See Nelson, 131 F.3d at 1237.  "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"  Powers, 207 F.3d at 435.  Claimant has not shown that the ALJ was patently wrong in his credibility analysis.  The Court believes there is more than a scintilla

---

[5] 2:04-CV-00057 Doc. No. 24, P. 3-4.

of evidence supporting the ALJ's credibility determination; therefore, the ALJ did not err in his assessment.

III.     Whether the ALJ Properly Considered the Opinion of a Treating Physician.

Claimant argues that the ALJ erred by failing to consider Dr. Thrush's opinions, specifically alleging that the ALJ improperly rejected Dr. Thrush's opinion regarding Claimant's disabled status because it was not an issue reserved specifically for the Commissioner.  Claimant also argues that the ALJ improperly rejected Dr. Thrush's opinion based on Claimant's credibility analysis.  Commissioner contends that the ALJ reasonably found that Dr. Thrush's opinion was not entitled to significant weight, and therefore the ALJ did not err, because it was based primarily on Plaintiff's subjective complaints and unsupported by the objective clinical findings.

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ.  20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1).  Claimant, relying on Social Security Ruling 96-5p, argues that the ALJ may never reject a treating physician's opinion because it addresses an issue reserved to the Commissioner.  Claimant's argument is without merit.  Social Security Ruling 96-5p states that "under 20 C.F.R. 404.1527(e) and 416.927(e), some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.  The following are examples of such issues: . . . 5. Whether an individual is 'disabled' under the Act."  While Claimant is correct in stating that opinions from any medical source on

issues reserved to the Commissioner may never be ignored, SSR 96-5p further states

> treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."

Claimant states that the Commissioner has a duty to recontact treating sources when they opine on issues reserved to the Commissioner. However, this is required only when "the bases for such opinions are not clear." SSR 96-5p. The Commissioner's only true duty is to "evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." Id. "In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable factors in 20 C.F.R. 404.1527(d) and 416.927(d)." Id. These non-exclusive factors include: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d).

The ALJ did not improperly reject Dr. Thrush's opinion but followed the requirements set forth in SSR 96-5p. The ALJ properly considered Dr. Thrush's opinion, specifically the letter dated November 1, 2007, which stated that the Claimant "probably will get [social security disability]." (Tr. 226). The ALJ afforded little weight to Dr. Thrush's opinion because it was unsupported by objective medical findings. (Tr. 23 - 25). Specifically, the ALJ states on November 1, 2007, despite writing that Claimant has a pretty bad back, Dr. Thrush "not[ed] only that imaging studies showed a moderate grade II spondylolisthesis of L5 on S1 without any 'major disc herniation' shown on a lumbar MRI, and that the claimant takes only 'occasional'

Darvocet for pain with no surgery recommended." (Tr. 23). Additionally, the ALJ relied on Dr. Thrush's notes from April 2, 2007, "at a time when the claimant was performing 'heavy construction work,' that the claimant's chronic back pain was 'off and on.' On the same date, the claimant had mostly normal range of motion in the hips, knees and ankles, which is not consistent with his reports of severe pain in these joints." (Tr. 24). The ALJ properly considered Dr. Thrush's opinions according to the regulations and permissibly afforded little weight.

Claimant also argues that the ALJ improperly rejected Dr. Thrush's opinions because they were based on Claimant's subjective complaints, which the ALJ incorrectly discredited. Again, Claimant's argument is without merit.

Claimant relies on Langley v. Barnhart in arguing that the ALJ improperly rejected Dr. Thrush's opinion. In Langley, the ALJ completely rejected the treating physician's opinion after finding it was not supported by objective medical evidence. Langley v. Barnhart, 373 F.3d 1116, 1120 (10th Cir. 2004). The Court found the ALJ also erred by improperly rejecting the treating physician's opinion "based upon his own speculative conclusion that the report was based *only on* claimant's subjective complaints and was 'an act of courtesy to a patient.'" Id. at 1121 (emphasis added). Langley is distinguishable from the case at bar for two reasons. First, the ALJ did not altogether reject Dr. Thrush's opinion. Second, the ALJ did not reject Dr. Thrush's opinion solely based on Claimant's negative credibility analysis. The ALJ specifically states, "[i]n view of this determination concerning the claimant's credibility analysis, the Administrative Law Judge does not accept medical findings or opinions that are based solely *or primarily* on the claimant's subjective complaints, which appears to be the case with Dr. Thrush's report on November 1, 2007, discussed earlier." (Tr. 25) (emphasis added). Unlike the

31

ALJ's assessment in <u>Langley</u>, the ALJ cited other reasons for rejecting Dr. Thrush's opinion. Specifically, the ALJ states:

> [T]he Administrative Law Judge has considered the assessment by orthopedic surgeon P. Kent Thrush, M.D., dated November 1, 2007, which stated that the claimant has a 'pretty bad back' and 'an advanced degenerative problem in the back' but objectively reported no abnormal neurological deficits on physical examination, noting only that imaging studies showed a moderate grade II spondylolisthesis of L5 on S1 without any 'major disc herniation' shown on a lumbar MRI, and that the claimant takes only 'occasional' Darvocet for pain with no surgery recommended.

(Tr. 23). The ALJ does not reject the report based solely on Claimant's subjective complaints; rather, the ALJ cites Dr. Thrush's own report to show the lack of objective medical findings to support his conclusions. Substantial evidence in the record supports the ALJ's decision to accord less than controlling weight to Dr. Thrush's report dated November 1, 2007.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because the ALJ's decision to deny Claimant Social Security benefits was supported by substantial evidence. The ALJ correctly identified and considered Claimant's impairments, correctly assessed Claimant's credibility, and afforded appropriate weight to the treating physician's opinions.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the

32

District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: September 29, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE